Good morning, Your Honor. May it please the Court, Tim Hoover for Salat Surah Abdi. Mr. Abdi is the petitioner in this action. He's a citizen and native of Somalia. He's a Muslim who practices Sufism, which is a mystical, spiritual, and ritualistic type of Islam. It's a minority religion where he comes from in Somalia. And being Sufi is extremely dangerous in Somalia because of the presence of Al-Shabaab, an affiliate of Al-Qaeda, a jihadist militia group that imposes its own interpretation of radical Islam by way of violence on Somalians generally and on minority religious groups. It's violent, well-funded, and it's good at what it does, which is terrorize, amass money, subjugate, and require fealty. It terrorizes families like Mr. Abdi's because of their religious beliefs. Mr. Abdi is also a member of the Ghar clan, a small minority clan where he comes from that's subjected to violence from the majority Khabar Ghadir clan. Now, there's no dispute that there's high risk of terrorist and clan violence in Somalia and that that's widespread. But this petition is not about generalized risk or generalized threats. Rather, it's Mr. Abdi's asylum based on violent, tragic life and family-altering events that he and his family went through beginning in 2013. First, in 2013, late in the year, his father was killed by the Al-Shabaab terrorist group for being and practicing the family religion. Mr. Abdi was seriously threatened thereafter by the group. Nearly simultaneously in following the death and the murder of his father, Mr. Abdi's family farm was part of a longstanding, long-running tribal land dispute with the majority Khabar Ghadir clan, which resulted in violence between the majority clan and Mr. Abdi's brother. Mr. Abdi's brother, defending himself, killed one of the majority clan, and after that, the clan chased the brother and vowed to seek vengeance and revenge on the brother. Counsel, we do have the facts, which are complicated, and I think you're accurately reciting them, but we do have them. Let me ask you this. Was a credibility determination made by the immigration judge? A credibility immigration, excuse me, Judge. The immigration judge. A credibility determination was not made by the immigration judge, and on appeal, the immigration judge was credible, and of course, that's why, that's one of the legal reasons on de novo review that you need to send this back. I mean, this is... Correct me if I'm wrong, but when an I.J. is required to ask for corroboration, only if the petitioner is found to be credible, but there's not enough evidence. Am I correct? I think you generally stated correctly, Judge. Yes. So, the fact that the immigration judge asked for more evidence sort of implies a favorable credibility determination as the BIA determined it, correct? I would agree, although if I could just respond to the second part of your question, which is he never asked for more evidence. He ruminated in his decision, and he did ask Mr. Abdi, do you have supporting evidence, but one of kind of, I call it the three legal error prongs of Diallo and Parada-Sova is, first of all, you have to make, you're absolutely right, you have to make a credibility determination, and then you need to explain, and this is the I.J., why it was reasonable to expect additional corroboration. You're right, Judge, he didn't find him incredible, and in Parada-Sova, this is the footnote, it's fundamentally unfair to require corroboration without telling the alien or the petitioner in the first instance of the need for it and the chance to provide it. Well, how would the I.J. be able in this case, or in many cases, be able to specify the particular kinds of documents that would corroborate? I mean, we often have cases involving claims of torture, people who have been in the hospital, and the I.J. says, you really have to produce those hospital records, I don't care how you get them, but you've got to get them, because you said you're in the hospital, and if you were tortured, that will show it. But here, how does a death certificate show that a person was shot because of their religion, as opposed to, as the immigration judge found, because of an effort to steal the family land? You're absolutely right, Judge, you're exactly right, and what the court, I think, is stating is the regulation and the BIA standard, which is documentary corroboration is required only for material facts, which are central to the applicant's claim. So here, it turns out he was providing the birth and death certificates for the father, but yeah, there's no contemporaneous account, nor would it be reasonable to expect it, of rural, southern Somalia, terrorist violence by a group like this. Are you arguing that his death, as just his death, confirms Mr. Abdi's argument? The death of the father, how would we know the cause? How would anyone know the cause? But he couldn't even get a death certificate, correct? Well, so a couple questions there, if I could take them in order. He was able to get the death certificate, and it was submitted to the BIA, and the BIA refused to remand or assess the reason why he didn't get the death certificate. But of course, the panel is well familiar with the idea that, you know, an applicant's testimony alone, if credible, here, deemed credible by the BIA, not found not credible by the IJ, can be enough to support an asylum claim, without doubt, Judge. So the answer to your question is, corroborated documentary evidence, and we certainly hope the case is remanded, and he certainly has shown the ability to provide it with witness statements, but I'm not sure it's necessary in the first instance, correct? Would you take Mr. Abdi's argument of why his father was killed? Because he's credible, we can rely on that. You can rely on it, and yes, he explained that he was not killed in some kind of random street fight, but it was the practice of the religion, the ritualistic group killed him for that reason, and then threats were made to Mr. Abdi subsequent to that. Absolutely, Judge Pooler. Now, we have received some of these documents. Somehow, I don't have the letters from neighbors, and I don't know what they say, but when I look at the English version of the death certificate of the petitioner's father and brother, what am I looking at? The English version, is that a translation? Yes, you're looking at a translation, I believe, and this was information provided to the BIA, and so the certificate, the translation, and I think there's a certification as well, and this is in the administrative record that indicates that it was death by gunshot. No, I understand, but I understand. I can read it, but I can read it because I only read English. I'm monolingual, so the question is, what am I looking at? Is this a document from the local government of Mogadishu, the English version? My understanding, Judge, as submitted to the BIA is yes, it's a document from the local governmental unit in Somalia. Well, I have to tell you, I'm kind of troubled by the fact that there are three or four freehand stamps in the upper right corner of both documents, and they are identical. I mean, if you put one behind the other with a light, they're identical. They're in the same spot, in the same attitude, in the same overlaps, and one is from 2014, and the other is from 2018, so I have to say that I'm concerned that what I'm looking at is not what you'd call authentic. My best answer, Judge, I have it in front of you. You're looking at the administrative record, and I see and recognize the multiple stamps. All I could say is, given the import of the document, and that being kind of the only question, that should be, I think the government might say, sussed out or figured out before the immigration judge. I mean, the government hasn't contested or said that the father wasn't shot, didn't die in late 2013, and wasn't murdered, and so the IJ decision, going back to your original question, Judge Jacobs, was, you know, I don't make a statement. We would say he implicitly found him credible, but I need more corroboration of the father's death. We've shown that. That's been submitted by Mr. Abdi to the BIA, and certainly we think, and this is a separate round for remand, that the BIA should have remanded to the IJ to consider that in the first instance. Yeah, but what I'm concerned about is that we're looking at these documents for the first time, and I mean, my untutored eye immediately shows aspects of it that make them suspect documents, but maybe that's a matter for the immigration judge, rather than for me. I just, you know, we have accepted these documents, and so I'm the first, we're among the first judges looking at them. Well, I didn't mean to interrupt, Judge. No, no, go ahead, please. I would just say so the documents specifically you're looking at, there's two sets. There's what you're looking at that were submitted to the BIA, and there's the set on appeal related to the brother's death. I'd love for this court to take a broader role in determining this in the first instance, but I've learned from my other immigration cases that the course is remand, and it remanded the BIA with specific instructions, and you know, just one more note. I know I'm over my time. You know, this, he was without counsel. He was in Batavia. He didn't speak English, and even the government had problems with what they call their biometric check, administrative page 120, so they couldn't even get that done by the time of the hearing. What is, I'm sorry, but what, I'm ignorant on this stuff. What is the biometric check? My understanding, Judge, so Mr. Abdi showed up at the border. He lost his, yes, he lost documents in Columbia. I'm just making, I think, a fair point that this idea to expect corroboration, detained, non-English speaking, no counsel, not able to access the the most modest opportunity to provide that, but in any event, for that and also the mixed motive analysis, certainly we think remand is required. Is it all of the errors that you identify cumulatively, or does any errors that you identify suffice for remand? Some of these errors are, you know, arguably minor, but I'm interested in your answer. My answer, Judge, is any of them are sufficient for remand. Certainly, we haven't talked about it, but the mixed motive error in basically finding there was one reason instead of considering the clan nature of the tribal dispute certainly would suffice. We think the remand error on its own would suffice, and the reason I really appreciate the court's question is when the court looks at these tough asylum cases, it often says, and I think this comes from your decisions, we have to look at the situation as a whole, and I think here one thing that wasn't explored before the IG was the interrelationship of this violence being the minority religion and the minority tribe, the long-term land dispute that comes to a head after the father is murdered because of his religion. But, Judge, you don't could remand on the mixed motive ground or the failure to consider the documents, or, of course, the court has the power in appropriate cases, given that the evidence that we've developed to remand for consideration of all of that. Why can't we read the, extend your time and perhaps wear you out, but why couldn't we assume based on the findings that were made by the immigration judge that this dispute over the land was long-standing and that the difference in religious affiliation was of long-standing, maybe generations, and that what provoked the threat to your client was the act of his brother in killing one of the people trying to the timing would seem to suggest what caused the threat. Judge, I'm happy to go as long as you want. It's great to be in front of the court again. What the air there, and the reason that the IJ aired is, this was not a, I call it air quotes, land dispute. It was a tribal land dispute, and so the violence occurs coming to the head of this majority clan trying to take the land for clan-based reasons, for domination-based reasons, on this smaller Gar clan social group, and so I think the answer, and that's the epitome of the decision in Ashira by Judge Pooler and yourself about the mixed motive. You can't push to the side evidence in the record, unrebutted, that shows that there's mixed motive. It's not the central reason. It's one central reason or contributing to it. Thank you, counsel. You reserve two minutes for rebuttal. Thank you, Your Honor. Will he affirm counsel for the government? May it please the court, my name is Jeffrey Hall, and I'm arguing on behalf of the respondent. In this case, while the petitioner challenges the decisions to deny him relief as a refugee, he does not challenge that the evidence was sufficient to deny him relief. Rather, his challenges are based solely on the idea that the board and the immigration judge, despite issuing lengthy opinions, still did not show that they understood the standards well enough to satisfy him. But petitioner here seeks far more than the law requires, and finding that the petitioner needed additional corroboration to prove his persecution from al-Shabaab, the immigration judge made all the findings required under cases like Liu and Diallo, that such corroboration was reasonably expected and necessary, but was missing and without a good explanation. Similarly, in evaluating the petitioner's claim of persecution from Haber-Gadir, the immigration judge laid out the proper standard of whether his minority clan status was a central reason for the persecution, considered the evidence, and found that the petitioner's minority clan status was not. I'm sorry, but what do you say to your adversary's everything relating to the land dispute is in a context of one tribe seeking to drive another tribe out of its dominant territory? Your honor, that's correct. It is in that sort of general context, but the immigration judge was very careful. He didn't say that necessarily meant that everything, or that he didn't conclude totally that the land dispute had nothing to do with the clan status. He simply found on that, for the land dispute itself, that was not past persecution. And then he addressed the only thing that could possibly qualify as past persecution, or create a well-founded fear of persecution here, which was the threat against petitioner's life. And the immigration judge went through all the evidence, and then nevertheless found that the real motivation, that there was no motivation to go after the petitioner based on his clan status. It was based on retaliation for the loss of the individual's life. And I think it's also important to say that there's a difference between causation here. Approximate cause is always a difficult issue in figuring out what's the but-for cause and everything, but that's not what you need to decide. It's really just motivation. And all of the evidence shows that the real motivation, and really the only motivation here in any substantial way, was that these two people that came after him were the sons of the slain individual. They were seeking originally just his brother's life, and then went after the family only because they wanted to pressure that brother to come out. I didn't see that the people who came after him were the sons of the man who was killed. Your Honor, that's pretty clear from the record. So if you go back I'm not sure. Where would I look to find that? Sure, in two places. One in the record itself, he explains that when he encountered the two individuals on the road with his donkey, that they said, you killed our father and then ran after him. So clearly it's the sons there. And then in the credible fear interview where he describes at more length the sort of individuals that came looking for him in the village and went to his house and everything, he said that the two or three times that those came, it was the two individuals, and that they, again, said that your brother killed our father, we're going to kill you. Okay, thank you. So yes, yes, Your Honor. So I think that it's very clear that we're talking about the two family members of the slain individual. It's not Haber-Gadir as a general tribe. And I think the court picked up on that in saying that sort of Haber-Gadir in general was not coming after him. They weren't looking. They didn't find him. But it really was these two individuals. So I think the record is the, and again, we're not talking- Where does the immigration judge in the decision discuss the possibility of a mixed motive? Your Honor, well, at the very beginning, this is, remember, an oral decision from the judge. He laid out the central motivating factor analysis. And then in his decision, he said that there was the alleged retribution that the Klan is attempting to visit upon respondent is not premised on the respondent's minority Klan membership, but rather the violent death suffered by one of Haber-Gadir Klan members. So he's saying that he's not saying that it can't be two things, but he's saying that it's not. It factually is not. It's one thing and not the other. That doesn't show that he doesn't appreciate that there isn't a potential for mixed motive. In all of the cases the petitioner cites where a court found that the immigration judge didn't properly consider it, it not only was the case that just didn't give the standard, but also that the evidence was very clear that the persecutors that were seeking the person's life or coming after them had basically said to the persecuted party, hey, we're coming after you because of your protected status, in addition to the other thing that we're worried about or that we wanted to do for. And so in those cases, it was very clear that there was that potential. And then the immigration judge just entirely ignored it and said that there's no basis whatsoever to find that the persecuted on a protected ground, completely ignoring the evidence. And that's not at all what occurred here. The BIA proceeded on the assumption that the immigration judge made a favorable credibility ruling. And that seems to me likely because the immigration judge asked for corroboration, which if you didn't believe the person in the first place, corroboration wouldn't really do much good. So assuming that he's credible, he testified, I believe, that his father was killed while performing a Sufi ritual of blessing the land with animal blood. Am I correct? Your Honor, and sort of. I don't believe that the testimony was specifically that he would kill during a ritual. The petitioner back in his credible theory interview said that the fact that he did these rituals was one factor that al-Shabaab came after him. But there's nothing particularly about that. He was killed on his porch, on his, you know, on his porch. But the problem was not that. The problem was that all of the specifics were missing about the timing of the death of the father. And it was a very central factor. Really, the insufficiency of the corroboration was what was identified. Well, yes, Your Honor. But the reason that he went to that insufficiency of the corroboration was because petitioner's testimony was very nonspecific in general. He didn't remember, pressed multiple times in both his credible fear interview and before the court. He couldn't remember even the month, much less the date of his father's death. But he had the rest of the dates well memorized. And this was the central factor setting off everything in this case. The issue that Judge Jacobs, I think, is pointing out is that there is no adverse credibility determination, notwithstanding the deficiencies that you describe, notwithstanding the lack of corroboration. I mean, in the mind run of cases, at least that we see, I think, you would expect an adverse credibility determination. And there is not one here. Your Honor, this case is entirely consistent with a number of cases that we put in the record, including Yan-Wan Chen, where the court, I mean, originally there, the IJ was so negative that the BIA assumed it was an adverse credibility finding, but then reversed later on and said, no, it's sort of where it's presuming the petitioner is credible, but nevertheless, additional corroboration was needed. Here, the immigration judge did exactly what he was supposed to do, which was presume the petitioner credible, but nevertheless point out where additional corroboration was needed because otherwise his testimony did not satisfy the burden of proof. And he needed that additional corroboration to satisfy the burden of proof. That's clearly what he said in his opinion. That's clearly what the BIA affirmed on. And that's entirely appropriate under the Real ID Act. Is it correct that we require from the IJ, the immigration judge, some explanation of the deficiency? In other words, some explanation as to what sort of corroboration has been offered is insufficient. Is that right? Your Honor, I think that the case law suggests that that is certainly important for the immigration judge to do. But you also have to look at cases like Lou, where none of that happened. And nevertheless, this court still affirmed the ruling because it really, it said it is petitioner's to corroborate his testimony. And here the immigration judge did far more than that. He questioned petitioner pointedly about the lack of the death certificate. He gave an implausible explanation. And then in his oral ruling, he explained why it was unreasonable for the petitioner not to have corroborating documents, including that he spent two years in Angola and went through a circuitous and complicated smuggling process that he apparently planned out, but nevertheless did not obtain any documents to corroborate his testimony. And he remained eight months in his native country of Somalia. Yes, Your Honor. So he remained in the country. He had an opportunity to get documents there. He was in contact with his family while he was in Angola and could certainly have obtained documents there. So there was plenty of opportunity and he just didn't do so. Let me ask you this. These documents, these death certificates, have the originals been filed? Your Honor, if I recall correctly from the record, the original death certificate, but not its translation for the father was filed before the board of immigration appeals. Of course, the petitioner didn't explain why he was not able to get it before. And it was certainly prepared before he filed that before the board of immigration appeals, back when he was in Somalia, in fact, in 2014. But the other documents were put only before this court in additional filing. I think there's the original death certificate for the father with the translation in English and then a original death certificate for his brother, but no formal translation. You mean the original document with the stamps? Your Honor, certainly the petitioner is more familiar with the record. So if he's claiming that it is an original in English with the stamps, then I suppose that we wouldn't oppose that. I'm not sure how one in English would be original. I mean, how it would be original in Mogadishu, I don't know. I don't think English is a second language in Somalia. It's Italian, isn't it? Your Honor, I believe that English is not one of the most frequently spoken languages. Yes. I think there's a large number of them, though. Mr. Hall, just apropos Somalia, more broadly speaking, is it your contention that the Somali government has any significant power in those areas where al-Shabaab is in control? In other words, you know, there's a question about would might acquiesce to some of the conduct that's alleged here. But my sense is that it has no power, but maybe you can... It's not really a functioning government. Your Honor, I appreciate your point, but I think that as the immigration judge found, the record does show in the country reports that the government is nevertheless actively fighting it. And there's no evidence that would... You know, you could say the same thing about the civil war at a certain point here. The question is, does the Somali government have any real power in those areas that are controlled by al-Shabaab, which I understand is the area at issue here? Your Honor, I would say two things. One, that is a separate question from the mixed motive analysis, and that's really the way in which Petitioner is challenged. So it isn't on acquiescence to persecution, although there's a question with the cat claim. But that's not an issue with the persecution claim. But I would say this also, acquiescence is a very high standard. It's not merely sort of can't control it, but that knows about something happening, knows that he has a duty to do something and simply doesn't do it. And I don't think there's anything on the record that there would be persecution from al-Shabaab in this case, knew about it and didn't do anything. Again, Petitioner didn't warn the police that they would come after his father. I don't think anybody knew in advance that he would come after his father. And after he left the house, there was no more trouble from al-Shabaab. So, but really the most important thing is that the standard proof wasn't met, his burden wasn't met here to demonstrate the persecution on the behalf of al-Shabaab. And that's the ground on which the... It sounds like you're really also not disputing that the father was shot and killed. Well, Your Honor, I think that the circumstances of the father getting shot and killed are disputed or unclear at the very least. As we previously discussed when opposing counsel had the podium, he says, Mr. Abdi gives his analysis of why his father was killed. And since he wasn't found not credible, aren't we bound to accept his description of why his father was killed? No, Your Honor. He still has to meet his burden of proof to show that it was on a protected ground and that that was a central motivating factor, same as in his other claim. And to do that, the immigration judge found that he needed additional corroboration. And I want to be very clear, Petitioner is not challenging that fact. He's not challenging the fact that additional corroboration was required. He's simply challenging the fact that the way in which the immigration judge went about the corroboration process isn't quite sufficient, even though it is clearly sufficient under cases like Yan Wan-Chen and Liu. He's also challenging the conclusion since he has subsequently supplied corroboration. Isn't that correct? Your Honor, so again, that information that was filed, well, it was filed well after he was supposed to do so. And he did it in a way that was... But he did it. Yes, but he did it in a way that is insufficient under the case law to make any difference to his claim. He did it before the Board of Immigration Appeals. Didn't explain why it was previously unavailable. That is absolutely required. There is no case law that says that the Board of Immigration Appeals should have accepted it at that point. So he has no basis to claim. And now he's filing other things in this court. And this court... I mean, but you do appreciate that it is an unappealing argument to say that a person who does not speak any English and has had no education would have the resources and the wherewithal to collect this material. I mean, if, and I'm not sure the condition is satisfied, if these documents are authentic and not suspect, which is a matter that's not for us to decide, they look to be corroborative of some parts of the petitioner's story. That is to say, his father was killed, his brother was killed, the approximate dates. And it's sort of unappealing to say that since he got it after the hearing, then in circumstances in which the immigration judge failed to make any credibility finding and opportunity to gather this information from another country on another continent, that we should ignore it. Your Honor, so I would say two things. One, the immigration judge... So petitioner said basically that he wasn't going to be getting anything additional before the immigration judge. And that's where he should have... The immigration judge also explained why he should have been able to gather this information before he left. That's unassailable, the conclusions. And really, again, you have to find that any reasonable fact finder would be compelled to conclude to the opposite of that. And I appreciate that when he went up on appeal, he did get these documents. But again, he didn't explain why he couldn't get them. He got them within three months, even though he was detained for six months. He didn't have immigration counsel at that point. And he hadn't tried to get them before he left. So at that point... He did not have counsel. Not at that point. No, Your Honor. So again, he was able to do something that he said he couldn't do. The immigration judge was under no obligation to assume that he could do something that he said he wouldn't be able to do or hope that if you gave him more time that he would get it. And at that point, the case was closed. He moved to reopen with a deficient petition. He hasn't moved, to my understanding, to reopen again based on the new information that he put before this court, which he could potentially try to do. But I also want to be... Just if I can address the new evidence, just very briefly, Your Honor. Please. It doesn't necessarily corroborate his story. So he said that he couldn't remember the date or the month of it, of his father's death occurring. But according to the death certificate, it was November 30th, which was the day before December. And we know from his other testimony that his brother killed the man in early December because there was almost a month elapsed before his brother left, but that was still in 2014. So if you put all that together, his father died only a few days before his brother killed the man. But he's saying that in all his interviews, he made it sound like it was at some point in the distant past in 2013. He couldn't remember it. And I think that really does call into question what he was trying to say. And then the other new evidence from the neighbors, for instance, gives the date as December 30th. At that point, it would have been after his brother killed the man, which throws the timeline completely apart. And also, if his brother really has been killed by Haber-Gadir, then according to the record, there's no reason to expect that they would come after Petitioner at this point. So I just don't think that the evidence really helps him the way that he says. But again, it was never properly before any court. It's not properly before this court. And therefore, his petition should be denied. Thank you, counsel. Mr. Hoover, we've retained two minutes for rebuttal. You may proceed, counsel. I just want to start where my opposing counsel left off. Those are all decisions and assessments. I'm sorry, Judge. I'm sorry, Judge. I just said, please start exactly where opposing counsel ended. Thank you, Judge. Those are all decisions and wild speculation with all due respect to the timeline of events. And I don't think it's accurate of either what the IJ did. The IJ did not make any finding or assessment about the lack of corroborative documents, just said there is no corroboration. The IJ did so with his own wild speculation. This is the IJ decision at 7, 8, and 10, that he had problems with the claim because more family members weren't murdered, that the mother wasn't murdered, that the brothers weren't murdered. This is not the kind of record or decision that with all due respect to the government, that the court should consider affirming. Wasn't there also a finding that family members continue to live there, I think on the farm, unmolested? The family members did not all immediately flee. My point though, Judge, is the whole family doesn't have to be wiped out for there to be a valid asylum claim. That is certainly true. But if other family members, like your client, continue to live there unmolested, that would be persuasive evidence, or could be persuasive evidence, that your client faces no harm if he goes home. It could be some evidence, I grant you that, Judge. The IJ, though, found, because of the lack of corroboration, that there wasn't even a death proven. So the analysis is more basic. With regard to what the IJ did, he never gave him a chance. He never said in the hearing before, or the prior appearance, here's what the corroboration I'm expecting, or never told him in the hearing. He just asked him his explanation and why he didn't have anything. The IJ did not find the explanation implausible. And as I hear the government argue its case, I hear it say two things that support supposedly affirming. By the way, we do argue that the evidence was perfectly sufficient for their finding that asylum should have been granted. In our gray brief at five, we explain that. But that the date of the father's death, he wasn't sure of it. And that his explanation was not plausible. Again, the IJ didn't find that. So you didn't hear my opponent talk about Diallo or Pora da Silva. That's the rubric and framework that the BIA and the IJ are well aware of for these claims. And they absolutely ignored. And if I... Mr. Hoover, can you, just on the mixed motive, before you end, the mixed motive alleged error. The IJ, as the government points out, does specifically say that it concludes that the alleged retribution that the Klan is attempting to visit upon the respondent is not premised on the respondent's minority Klan membership. And that, it seems to me, extinguishes explicitly the possibility of a mixed... Or eliminates the possibility of a mixed motive. I think, Judge, and you put your finger on the legal error. He applied an overly stringent standard, just like the court in the Shira and so many other cases vacated. Because in the face of credible evidence, right? That we've talked a lot about, presumption of credibility. He says, and IJ at eight, IJ at eight, IJ at 10, to be based on, is not, and is. These definitive statements that are inconsistent with the credible testimony of Mr. Abdi. And so that's the legal error. And in all those other cases, Judge Pooler's decision in a Shira, the exact same thing happened, Judge. There are these conclusive decisions that this is not a mixed case. That the central reason was a non-asylum type of action. And those were all vacated. So I think you've put your finger on the legal error. If I can say one more thing, Judge, with regard to the cat claim, there's plenty of evidence in the record. And by the way, on corroboration, the country conditions report and the religious conditions report were submitted by Mr. Abdi. Those are in the record. But with regard to acquiescence and torture, A266, A213 through 14, the credible fear interview, Mr. Abdi describes going to the police and to report the violence with regard to the majority clan. And the response is, what clan are you in? What member of a clan are you in? That's the exact kind of chaos that prevails in Somalia today. Was visited on his family and should result in this going back for a hearing under the proper legal standards. I'm happy to answer any other questions of the court. Thank you. Thank you, counsel. Thank you both. We'll reserve decision on this very interesting case. Thank you.